[No. D016780. Fourth Dist., Div. One. Jan. 5, 1995.]

JARIDIJON SALASGUEVARA, a Minor, etc., Plaintiff and Appellant, v. FREDERICK FRYE, Defendant and Respondent.

COUNSEL

Steven J. Weinberg, DeGoff & Sherman, Victoria J. DeGoff and Richard Sherman for Plaintiff and Appellant.

Lewis, D'Amato, Brisbois & Bisgaard, H. Gilbert Jones, James E. Friedhofer and James J. Wallace II for Defendant and Respondent.

OPINION

NARES, J.—

### QUESTION PRESENTED

The proper standard of care for a person administering a diphtheria, pertussis and tetanus (DPT) vaccine to an infant is the sole legal question in this appeal. Trying the case without a jury, the court entered judgment in favor of Frederick Frye, M.D., in the medical malpractice action of Jaridijon Salasguevara, a minor by his guardian ad litem,[1] arising from Frye's administration of DPT shots beginning when Dijon was one week short of four months old. The court applied a standard of care under Health and Safety Code[2] section 429.36, relating to liability for administering an immunizing agent to a minor, requiring the plaintiff to prove gross negligence or willful misconduct where the immunization is required by state law. On appeal Dijon contends ordinary negligence principles should apply with the result we should enter judgment for him on the basis of the trial court's statement Frye breached the ordinary standard of care for physicians. We affirm.

### FACTUAL BACKGROUND

Dijon was born September 24, 1980. His birth and initial development were normal. His mother routinely took Dijon to his pediatricians, Frye and Ronald G. Lehman, M.D., for well baby visits, checkups and vaccinations.

At his three-month visit to Lehman, Dijon had a cold, as a result of which Lehman waited until the next regularly scheduled visit on January 15, 1981, to give him the first in a series of DPT vaccinations to immunize him against diphtheria, pertussis (whooping cough) and tetanus. Dijon showed no adverse reaction to the first shot.

On January 24, 1981, Frye, board certified in pediatrics since 1964, saw Dijon for the first time and prescribed Ampicillin and Dimetapp medications

---

[1] As in the appellant's opening brief, we refer to the plaintiff as Dijon.

[2] All statutory references are to the Health and Safety Code unless otherwise specified.

for him due to an upper respiratory problem, irritation of the eustachian tube and ear infection. The next day, while he was waiting to be fed, Dijon had his first convulsion and was admitted to the hospital for two days.

As a result of another seizure Dijon was hospitalized for 11 hours on February 20, 1981. Again he was hospitalized for a seizure on February 26 and he suffered two additional seizures during his treatment until his release March 3, 1981.

On March 9, 1981, Frye gave Dijon a second DPT shot, and 20 hours later, on March 10, Dijon had another seizure. As of March 9, eight days had passed since Dijon's last seizure, and he had been released from the hospital for six days.

Between the time of his first seizure January 25, 1981, and March 15, 1981, Dijon was given multiple electroencephalograms (EEG's), spinal taps, a CT scan and blood work, none of which revealed the cause of his seizures. John H. Menkes, M.D., board certified in pediatrics and neurology, was of the opinion Dijon had an "evolving neurologic disorder"[3] as of March 9, 1981. John Tilelli, M.D., board certified in pediatrics, pediatric critical care and medical toxicology, also diagnosed Dijon as having an evolving neurologic disorder as of March 9, 1981.

Tilelli testified that giving the second DPT vaccination shot on March 9, 1981, was "strictly contraindicated." Board-certified pediatrician Jeanette Wilkins, M.D., testified that under the circumstances of Dijon's history, giving the second shot was "absolutely contraindicated." Medical literature, including the DPT manufacturer's package insert and the Red Book of the American Academy of Pediatricians, suggested that administration of DPT to a child with an evolving neurologic disorder is below the standard of care.

During Dijon's 11-hour hospitalization on February 20, 1981, he was given Phenobarbital intravenously to control the seizures. On Dijon's release Frye prescribed Phenobarbital to prevent him from having further seizures. Again after Dijon's return to the hospital on February 26, 1981, he was given Phenobarbital during his stay. Frye's notes of the February 26 hospital admission due to an additional seizure state, "Parents apparently have not given phenobarb [sic] as ordered following discharge." Phenobarbital was again prescribed on Dijon's discharge March 3, 1981, but Frye expressed

---

[3]An evolving neurologic disorder is one whose nature has "not yet declared itself." A child with recurrent seizures not under control falls into that group, and the first question is whether the seizures can be brought under control. Once the seizures are controlled it can be determined whether the child is developing normally. In Dijon's case by March 9, 1981, there had not been enough time since his last seizure to allow the seizure to declare itself.

doubt the parents gave Dijon any Phenobarbital on March 10, 1981, when he asked Dijon's mother to increase the dose as a result of the additional seizure 20 hours after the second DPT shot was given. Frye apparently believed Dijon's seizure disorder was under control at the time of the second shot although there were the above stated indications Dijon's father and mother were reluctant to give the necessary Phenobarbital. Frye believed the seizures were not caused by the DPT and would not have given the vaccination with the pertussis component if he had thought otherwise. Frye thought the risks of getting pertussis were greater than the 1-in-320,000 risk of encephalopathy. Michael J. Sexton, M.D., Dijon's physician from October 1982 to the time of trial in August 1991, diagnosed Dijon's condition as seizure disorder and developmental delaying and retardation, a diagnosis that is not related to the immunizations. Frye's expert, pediatrician Paul F. Wherle, M.D., a specialist in infectious diseases and immunology, opined that the second DPT shot was proper and Frye complied with the standard of care.

There was additional conflicting evidence on the question of Frye's compliance with the standard of care in administering the second DPT shot, and on causation.

A month before the August 1991 trial Dijon experienced two seizures for which his Phenobarbital dose was increased. He had another seizure over two years before the July 1991 episodes. The continued treatment of Dijon was to try to maintain therapeutic blood levels of anticonvulsants. As of the trial Dijon was extremely and permanently retarded, both mentally and physically.

## TRIAL COURT DECISION

In its statement of decision, the trial court found that DPT immunization is required under section 3381, and thus the willful misconduct or gross negligence standard of section 429.36 applies. Applying the gross negligence standard to Frye's conduct the court concluded: "The Court finds Dr. Frye's conduct in administering the second DPT shot was not grossly negligent nor was it an extreme departure from the standard of care. Dr. Frye considered the risks to Jaridijon in administering the DPT shot and he considered the benefits of the shot. He believed Jaridijon did not have an evolving neurologic condition which contraindicated the administration of pertussis. This conclusion, although contrary to the Court's finding, is not grossly negligent. As noted above, even the experts with the benefit of a leisurely, scholarly study were unable to agree as to what constituted an evolving neurologic condition and were unable to agree on whether the second shot was contraindicated."

Because it was asked to make additional otherwise unnecessary findings which "may be helpful to the Appellate Court if the Court's decision on gross negligence is incorrect," the court found "Frye acted below the standard of care in administering the pertussis component of the DPT vaccination on March 9." On causation the court found: "Jaridijon's current condition results from a combination of Defendant's simple negligence in administering the second shot and Jaridijon's pre-existing seizure disorder. The resulting injury is not readily susceptible to an allocation between the two causes."

Based on its earlier finding there was no gross negligence, the court entered judgment for Frye.

## DISCUSSION

### Statutory Background

Section 429.36 sets forth a rather broadly worded immunity from liability for injury caused by an act or omission in the administration of vaccines to minors, as follows: "No person shall be liable for any injury caused by an act or omission in the administration of a vaccine or other immunizing agent to a minor, including the residual effects of the vaccine or immunizing agent, if the immunization is either required by state law, or given as part of an outreach program pursuant to Article 2 (commencing with Section 3395) of Chapter 7 of Division 4, and the act or omission does not constitute willful misconduct or gross negligence."[4]

Section 429.36 was enacted as part of a statutory scheme having a twofold purpose: "to provide medical or institution care or indemnification for children who suffer adverse reactions to required immunization, [§ 429.35[5]] and to exempt physicians and surgeons from liability for damages caused by negligent acts or omissions in the administration of immunizing agents." (*Flood* v. *Wyeth Laboratories, Inc.* (1986) 183 Cal.App.3d 1272, 1278 [228 Cal.Rptr. 700, 57 A.L.R.4th 901], fn. omitted, reflecting Legis. Counsel's Dig. to Sen. Bill No. 967 of the 1977 Reg. Sess. which enacted these provisions.)

---

[4]Section 429.36 was enacted originally in 1977. (Stats. 1977, ch. 1097, § 1.) A 1992 amendment added the provision making the section applicable to the shots administered to minors as part of an outreach program as defined, an aspect not involved in this case. (Stats. 1992, ch. 566, § 2.)

[5]Section 429.35 provides in part: "It is the intent of the Legislature to provide for care, including medical, institutional, supportive, and rehabilitative care, necessitated because of severe adverse reaction to *any immunization required by state law to be administered to children under 18 years of age*." (Italics added.)

■ For purposes of this case the key determinant for proper application of the section is whether Dijon's immunization shots were "required by state law." If the shots were required by state law Frye could be liable only if his conduct constituted "willful misconduct or gross negligence." Our resolution of the case is controlled by the "most fundamental rule" of legislative interpretation that " 'the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law.' " (*Flood* v. *Wyeth Laboratories, Inc.*, *supra*, 183 Cal.App.3d at p. 1277, quoting *Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].)

On the question of immunization required by state law, section 3381 reads in pertinent part:

"(a) As used in this chapter, the term 'governing authority' means the governing board of each school district or the authority of each other private or public institution responsible for the operation and control of the institution or the principal or administrator of each school or institution.

"(b) The governing authority shall not unconditionally admit any person as a pupil of any private or public elementary or secondary school, child care center, day nursery, nursery school, family day care home, or development center, unless prior to his or her first admission to that institution he or she has been fully immunized. . . ."[6]

Section 3381 specifies the diseases for which full immunization is required, including diphtheria, pertussis and tetanus. (§ 3381, subd. (b)(1), (5) and (8).) With respect to conditional admission section 3382 provides: "A person who has not been fully immunized against one or more of the diseases listed in Section 3381 may be admitted by the governing authority on condition that within time periods designated by regulation of the state department he or she presents evidence that he or she has been fully immunized against all of these diseases."

Immediately preceding section 3381, the Legislature declares its intent in part as follows:

"In enacting this chapter, it is the intent of the Legislature to provide:

"(a) A means for the *eventual achievement of total immunization of appropriate age groups* against the following childhood diseases:

"(1) Diphtheria.

---

[6]After the trial of Dijon's case the subdivisions and reference to family day-care homes were added to the quoted portion of section 3381. (Stats. 1992, ch. 1320, § 2.)

"⸳ . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(6) Pertussis (whooping cough).

"⸳ . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(9) Tetanus.

"⸳ . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"[10](b) That the *persons required to be immunized* be allowed to obtain immunizations from whatever medical source they so desire, subject only to the condition that the immunization be performed in accordance with the regulations of the State Department of Health Services and that a record of the immunization is made in accordance with such regulations.

"(c) Exemptions from immunization for medical reasons or because of personal beliefs.

"(d) For the keeping of adequate records of immunization so that health departments, schools, and other institutions, parents or guardians, and the persons immunized will be able to ascertain that a child is fully or only partially immunized, and so that appropriate public agencies will be able to ascertain the immunization needs of groups of children in schools or other institutions.

"(e) Incentives to public health authorities to design innovative and creative programs that will *promote and achieve full and timely immunization of children.*" (§ 3380,[7] italics added.)

Sections 3381 and 3380 succeeded substantively similar provisions in former sections 3481 and 3480 that were in the law since 1971.[8] (Stats 1971, ch. 833, § 1, p. 1660; §§ 3481 and 3480 were repealed by Stats. 1977, ch. 1176, the same statute which enacted §§ 3381 and 3380.)

In enacting section 429.36 (and § 429.35) it is apparent the Legislature viewed the then existing immunization scheme under state law (former §§ 3481 and 3480) as *requiring* immunizations of minors for the specified

[7]Subdivision (e) was added to section 3380 after the trial in this case. (Stats. 1992, ch. 1300, § 1.)

[8]Former section 3481 provided:

"No persons 18 years of age or under or, in the case of pertussis (whooping cough), six years of age or under, may be unconditionally admitted as a pupil of a private or public child care center, day nursery, nursery school, or elementary or secondary school unless prior to his

diseases, including diphtheria, pertussis and tetanus. A staff analysis of Senate Bill No. 967, as amended May 16, 1977, for the Senate Committee on Health and Welfare contains the following significant statements:

(Below the heading "PURPOSE")

"To require the Department of Health to maintain a program to provide medical care to all children who suffer an adverse reaction to a *state-mandated immunization.*"

(Below the heading "DISCUSSION")

". . . Under existing law, persons under age 18 *are required to be immunized* against . . . diptheria [*sic*], pertussis, and tetanus prior to entry into schools or other institutions." (Italics added.)

Similarly, a Fiscal Analysis of Senate Bill No. 967, as introduced April 13, 1977, states in part:

"This bill would require the Department of Health to maintain a program which provides medical care to all children under 18 years of age who suffer an adverse reaction to an *immunization required by the State.*

"It is estimated that a total of 2,225,626 doses of *State-mandated immunizations* (i.e., . . . diphtheria-pertussis-tetanus = 1,136,489) *are administered* annually in California *to children between the ages of 0 and 5 years.*" (Italics added.)

## INTERPRETATION AND APPLICATION

From the foregoing statutory history it is rather clear the Legislature believed its provisions for immunization of children before attending schools or the other designated preschool facilities constituted an immunization

first admission to school in California he has been immunized against such communicable diseases listed in subdivision (a) of Section 3480."

Section 3480 provided in part:

"In enacting this chapter, it is the intent of the Legislature to provide:

"(a) A means for the eventual achievement of total immunization in appropriate age groups against diphtheria, pertussis (Whooping cough), and tetanus.

"(b) That the persons required to be immunized be allowed to obtain immunization from whatever medical source they so desire.

"(c) Exemptions from immunizations under specified conditions.

"(d) For the keeping of adequate records of immunization so that appropriate public agencies and the persons immunized will be able to ascertain that a person is fully or only partially immunized."

program "required by state law." (§ 429.36.) Fortifying this conclusion is the statement in *Flood* v. *Wyeth Laboratories, Inc., supra*, 183 Cal.App.3d at page 1275, "Since every child in California must receive the vaccine, the demand is large and ongoing." *Flood* also apparently adopted the rectitude of the portion of an argument that, "Every child in this state must receive the DPT vaccine before being admitted into a school of any kind. (Health & Saf. Code, §§ 3380-3390.)" (*Ibid.*, fn. omitted.) We recognize that *Flood* was not ruling on the issue at hand, whether Dijon's immunization came within the meaning of "required by state law" in section 429.36.[9] Nevertheless, we find its dicta on this point represents a correct observation.

Additional support for this conclusion may be found in another, later-enacted statute, the "California Full Immunization Act." (Stats. 1990, ch. 606, § 1; § 322.8 et seq.) Section 2 of this act provides in part:

"(d) While *California has a legal requirement that children be immunized before entering school and licensed preschool and day care programs*, nearly 60 percent of California two-year olds are inadequately immunized at the present time.

"(e) It is recommended that children begin receiving polio, DTP (diphtheria, tetanus, pertussis), and MMR (measles, mumps, rubella) immunizations between 2 and 15 months of age, and have the Hib (haemophilis influenzae type b) immunization and all but the last DTP and polio immunizations by 18 months of age. However, many children do not receive immunizations until just before entering kindergarten.

". . . . . . . . . . . . . . . . . . . . . .

"(g) *Existing California law requires that any child entering school for the first time have four DTP shots*, one MMR shot, and three polio shots in order to enroll in school. However, one additional DTP shot and one additional polio shot are required if the child receives the other shots before the age of two. Up-to-date immunizations are also required in order for a child to enroll in licensed preschool and day care programs." (Italics added.)

Section 3 of the California Full Immunization Act reads in part: "The purposes of this act are to do all of the following: "(a) Encourage the state to establish and maintain a policy which would *allow for the full and ongoing immunization of all California children*." (Italics added.)

---

[9] *Flood* ruled on the question whether a manufacturer of DPT vaccine could receive the benefit of the immunity from liability of section 429.36 except in cases of willful misconduct or gross negligence. *Flood* held the manufacturer was not included within the term "administration" in section 429.36 and thus was not immune from liability under the section. (*Flood* v. *Wyeth Laboratories, Inc., supra*, 183 Cal.App.3d at p. 1280.)

Thus, both the analyses leading to the enactment of section 429.36 and later statements in other statutes, which use mandatory language such as "required" and "state-mandated" and express a goal of universal immunization, leave no doubt that the Legislature, at all times since the 1971 adoption of the child immunization statutes, viewed the law as providing that all children covered by section 3381 are required by state law to be immunized.[10]

■  Who are the children covered by section 3381? They are all children who will enter one of the educational or care facilities designated in section 3381: any development center, family day-care home, nursery school, day nursery, child care center, elementary school or secondary school, whether any of such facilities are private or public. This list is rather all-encompassing, omitting only children who never will attend one these facilities, perhaps as one never taught or cared for in one of the facilities, or one never to leave home and taught there through secondary school.[11]

The list also is not age-specific. For example, residents of child care centers may be infants. (See, e.g., §§ 1596.955, 1596.956, providing for a special program component, an "optional toddler program," in licensed child day-care centers for children between the ages of 18 months and 30 months; see also § 1596.813 concerning immunization of children in family day-care homes which are defined in § 1596.78 to include homes caring for children under 10 years of age; see also § 1596.792 listing exceptions from laws relating to child day-care facilities (§ 1596.70 et seq.), day-care centers (§ 1596.90 et seq.), and family day-care homes (§ 1597.30).)  ■  The Legislature has declared the recommended age for beginning DPT shots is

---

[10]Dijon argues there is a contrary indication of legislative purpose by quoting a portion of subdivision (a)(3)(A) of section 1 of chapter 566 of the Statutes of 1992, a legislative finding and declaration referring to a "Year 2000 Objective for Immunization" of 90 percent of two-year-olds and stating: "The State Department of Health Services has found: [¶] In California, fewer than half of two-year-old children are fully immunized for diphtheria, tetanus, and pertussis. Although state law regulating immunizations for children in schools and child day care facilities [citation] are enforced by the state department, resulting in adequate immunization levels for schoolage children of over 92 percent, there is no similar mechanism to require full immunization status at the two-year-old age level."

Patently, this is a legislative description of a finding by the state Department of Health Services, not a finding by the Legislature itself. Moreover, the thrust of the statement is to quantify the children immunized, not to set forth requirements of state law. Thus, the statement does not aid Dijon.

[11]Statutory exceptions apply only to: (1) persons 18 years old or older or seeking admission to a community college (§ 3384); (2) persons filing a letter or affidavit stating the immunization is contrary to his or her beliefs—subject to temporary exclusion if there is good cause to believe the person is already exposed (§ 3385); and (3) persons with respect to whom there is filed a physician's statement that immunization is not considered safe (§ 3386; see fn. 12, *post*).

between 2 months and 15 months of age, and for completion of all but the last DPT shot is 18 months of age. (Stats. 1990, ch. 606, § 2, subd. (e); see also Cal. Code Regs., tit. 17, § 6020, subd. (a), and table 1.) Only children seven years of age or older are exempt from the pertussis (and mumps) immunization requirements. (§ 3381; Cal. Code Regs., tit. 17, § 6020, subd. (e).)

Given the clearly stated legislative intent to achieve "total immunization of appropriate age groups" (§ 3381, subd. (a)) with respect to children to be enrolled in any of the wide range of facilities, and the Legislature's adoption of two months as the beginning age for immunizations (Stats. 1990, ch. 606, § 2, subd. (e)), we determine it is the intent of the Legislature that, unless a specific exception applies (e.g., § 3385—beliefs statement exception, or § 3386—physician's statement exception), all children in the age group from two months to seven years of age are "required by state law" to be given the DPT shots for purposes of applying section 429.36. Any other construction of the quoted phrase would defeat the legislative purpose of full immunization of children beginning at two months of age. Surely, protecting persons administering the prescribed vaccines from legal liability solely with respect to children actually enrolled in one of the facilities would only tend to reduce the chance of achieving the full immunization goal.

This conclusion means that a child need not be actually enrolled in one of the facilities mentioned in section 3381 in order to be deemed "required by state law" to be administered the DPT shot. The conditional enrollment provisions of the section establish a stop-gap mechanism designed to assure the highest percentage of immunization of children is achieved *eventually*. In other words, section 3381 does not establish the *time* at which the requirement attaches. Rather, it identifies the facilities likely to be attended by the vast child population that the Legislative intent shows is required to begin immunization starting at the age of two months.

Since our independent review of the statutes leads to the conclusion Dijon was a person for whom immunization was required by state law, we determine the trial court correctly applied section 429.36 to Dijon's case.[12] It misses the point of the statute to argue, as does Dijon, that he is removed

___

[12]We summarily reject Dijon's claim that because the DPT shot was contraindicated, he was exempt from having the immunization in the first instance, and thus the shot was not "required by state law" and the doctor was without protection under section 429.36. He furnishes no statutory or other reasonable basis for such a conclusion except the clearly inapplicable provisions of section 3386 which reads: "If the parent or guardian files with the governing authority a written statement by a licensed physician to the effect that the physical condition of the child is such, or medical circumstances relating to the child are such, that immunization is not considered safe, indicating the specific nature and probable duration of

from the category of persons required by state law to be immunized due to the fact the actual immunization could have been delayed to a later date close in time to enrollment in one of the facilities specified in section 3381, subdivision (b). As we have seen, from the statutory scheme it is apparent the Legislature has considered it likely that all infants in Dijon's circumstances will be enrolled in one of those facilities within a few years. In order to achieve "total immunization of appropriate age groups" (§ 3380, subd. (a)), the Legislature has determined those persons in Dijon's position are to be deemed required by state law to be immunized without regard to the imminence of any such enrollment. That Dijon's parents were not planning to send him to one of the facilities at the time the shots were given is irrelevant to the question whether the immunization was required by state law.

Dijon raises no issue concerning the propriety of the court's determination Frye was not grossly negligent. Accordingly, the judgment is to be affirmed.

### DISPOSITION

Judgment affirmed.

Work, Acting P. J., and Froehlich, J., concurred.

A petition for a rehearing was denied January 27, 1995, and appellant's petition for review by the Supreme Court was denied March 23, 1995. Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.

---

the medical condition or circumstances which contraindicate immunization, such person shall be exempt from the requirements of this chapter to the extent indicated by the physician's statement."

Obviously under the circumstances of this case, Frye did not and would not have prepared such a physician's statement. The exception of section 3386 simply has no bearing on the facts of this case.